LA CLAIR et al. v. UNITED STATES.

(Circuit Court, E. D. Washington, Southern Division. June 18, 1910.)

No. 35.

1. PUBLIC LANDS (§ 114*)—PATENTS—PRESUMPTION OF VERITY.
    Patents for lands issued by the United States carry the presumption of verity, and can only be set aside on the most clear and convincing proof; and the rule applies, although they are attacked by the United States in defense of a suit to restrain their cancellation by the department.
    [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 314-322; Dec. Dig. § 114.*]

2. INDIANS (§ 13*)—RIGHT TO ALLOTMENTS OF LAND—ADOPTION INTO TRIBE.
    Plaintiffs, who were formerly members of the Puyallup Tribe of Indians, but were of Yakima half blood, were invited by the Yakimas to become members of that tribe for the purpose of sharing in the allot-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ment of the lands of their reservation in severalty, which they did, having been formally adopted by the tribe in accordance with its customs. The Indian agent and the allotting agent were fully advised of such action which was taken with their approval and with full knowledge of the facts recommended plaintiffs for allotments, and their recommendation was approved by the Secretary of the Interior, and patents were issued to plaintiffs, which recited that they were Indians "residing on the Yakima Indian reservation," who had been allotted land therein. None of plaintiffs had received allotments elsewhere. The lands have since been for the most part resided upon and improved by the allottees, and have become valuable. *Held*, that the things done were all that were required to make plaintiffs members of the Yakima Tribes, and that, even if official ratification of the adoption was required, the action of the department amounted to such ratification.

[Ed. Note.—for other cases, see Indians, Dec. Dig. § 13.*]

**3.** INDIANS (§ 13*)—RIGHT TO ALLOTMENT OF LANDS.

Plaintiffs were not debarred from the right to receive allotments on the Yakima reservation by the fact that their parents had received allotments on the Puyallup reservation as heads of families, and that plaintiffs were named in the patents as members of such families.

[Ed. Note.—for other cases, see Indians, Dec. Dig. § 13.*]

**4.** EQUITY (§ 85*)—LIMITATION OF ACTIONS (§ 11*)—ACTIONS BY—DEFENSES—LACHES AND LIMITATION.

The rule that laches or limitation cannot be invoked against the United States does not apply where the government is not the real party in interest, but, if successful, the litigation must inure to the benefit of private individuals.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 221; Dec. Dig. § 85;* Limitation of Actions, Cent. Dig. §§ 35–39; Dec. Dig. § 11.*]

**5.** INDIANS (§ 13*)—SUITS BY UNITED STATES TO CANCEL PATENTS TO ALLOTTEES—LIMITATION.

Act April 23, 1904, c. 1489, 33 Stat. 297, which authorizes the Secretary of the Interior to rectify mistakes and cancel patents to Indian allottees during the whole of the trust period for defects therein expressly mentioned, was not intended to render the general statute of limitations inapplicable by retaining jurisdiction over the lands during the whole of the trust period, except in the cases specified, and a suit by the United States to cancel such patents on other grounds is subject to the limitation of six years from the date of their issuance imposed by Act March 3, 1891, c. 561, § 8, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521), on suits generally to cancel patents.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

**6.** INDIANS (§ 13*)—PATENTS TO ALLOTTEES OF LAND—CANCELLATION—AUTHORITY OF INTERIOR DEPARTMENT.

Where the Interior Department by its officers and agents has recognized the right of Indians to allotments of land as members of a tribe, after full investigation, with full knowledge of the facts and without fraud, and allotments have been made and patents issued to the allottees, the department is without authority to subsequently cancel such patents because of a change in its interpretation of the law; nor is there any equity which warrants a court in canceling the patents at suit of the government, the allotments being satisfactory to the tribe from whose lands they were made.

[Ed. Note.—for other cases, see Indians, Dec. Dig. § 13.*]

Suits by Edward La Clair and 16 others against the United States. Decrees for plaintiffs.

Arthur E. Griffin, for plaintiffs.
Joseph B. Lindsley, U. S. Atty.
Charles A. MacMillan, Asst. U. S. Atty.

WHITSON, District Judge. These 17 suits have been brought in reliance upon the provisions of Amendatory Act Feb. 6, 1901, c. 217, 31 Stat. 760. Plaintiffs were allotted lands on the Yakima Indian reservation, and trust patents were issued under the acts of Congress which provide for the taking of lands in severalty. Act Feb. 8, 1887, c. 119, 24 Stat. 388. Inquiry having been instituted in the department and cancellation of such patents threatened upon the authority conferred upon the Secretary of the Interior by the act approved January 26, 1895 (Act Jan. 26, 1895, c. 50, 28 Stat. 641), as amended by Act April 23, 1904, c. 1489, 33 Stat. 297, the plaintiffs as they may under the first-mentioned statute are seeking relief against the proposed action, and since the causes involve the same principles of law and depend upon the same facts, differing only in detail as to the persons interested, they have been submitted together, and will be so considered.

Three Indian families are concerned, the members of which are each entitled to relief or none are so entitled, hence the following grouping. Causes Nos. 35, 36, 37, 38, 39, 40, and 41 embrace the La Clair family. Causes Nos. 42, 43, 46, 48, 51, 52, 53, 54, and 57 embrace the Ashue family. Cause No. 49 relates to the Winnier family, one member only of which is seeking relief. A part of the plaintiffs sue in their own right as patentees, while others claim as heirs at law of deceased patentees, but beyond this it will not be necessary for present purposes to follow the evidence relating to individuals. It need only be noted that the patents are each dated July 10, 1897, with the exception of that to Effie Ashue, which bears date June 23, 1900.

The bills proceed upon the theory that plaintiffs, while formerly of the Puyallup Tribe, are now Yakima Indians in virtue of their adoption by the latter; that the relation by consanguinity to the degree of the half blood both induced and justified this action; that, after adoption, they selected lands for allotment, which selections were duly approved and afterwards identified by the trust patents over which the present controversy arises; that this was done with the full knowledge and consent of the Indian agent and the allotting officers of the defendant, and was subsequently approved by the Secretary of the Interior, from all of which it is contended that the allotments were rightfully made, and, if not so made, that the defendant is now estopped by laches, as well as by the conduct of its officers, to assert to the contrary; and that the statute of limitations also stands as a bar to the disturbance of the existing status. No issue is raised concerning the relationship of the complaining parties but it is denied that they were legally accepted or adopted by the Yakimas. The legality of the allotments is denied on the ground that they are double, but the proceedings looking to cancellation are admitted. The defendant also interposes the defense of fraud, in that imposition was practiced by the plaintiffs who falsely represented themselves to be Yak-

ima Indians, and concealed the acquisition of lands theretofore awarded them upon the Puyallup reservation, whereby its officers were deceived, and led to make allotments and to subsequently issue patents for the selected and designated lands. There is practically no dispute as to the facts. The plaintiffs have brought forward witnesses to establish the essential averments of their petitions, while the defendant has not by testimony on its behalf put anything material in substantial contradiction. A summary of my conclusions will be generally applicable to each cause.

The Yakima Indian reservation was set apart by the treaty of 1855 (2 Kappler's Indian Treaties, p. 698, 12 Stat. 951). Fourteen confederated tribes participated in the negotiations and consented to the treaty provisions; these being designated as the Yakima Nation of Indians. They were originally opposed to the disturbance of rights guaranteed by the treaty. Up to the time that they were invited to segregate their interests they had held the reservation in common. When the taking of lands in severalty was proposed, they foresaw, clearly enough, that it meant the breaking up of tribal relations. The allotment of lands having become a vital issue, a council of all the tribes was held in 1893 under the supervision of the reservation agent and of Col. Rankin, an allotting agent. Just how the Indians were induced, if induced at all, to consent to this invasion of their domain which was to finally destroy the territorial integrity of the reservation, is not fully disclosed. It does appear that they eventually gave consent; but, in order to fully occupy the country reserved for their sole use and benefit and thereby avoid as far as possible intrusion by the whites, they concluded at this council to invite in from the surrounding tribes Indians of the Yakima half blood who had not theretofore received allotments on other reservations. This council was generally participated in by the Indians and particularly by the chiefs and head men. A committee was appointed said to consist of eight members. Lumley, a member himself, enumerated the following: Chief White Swan, Capt. Æneas, also a chief, Stick Joe, Capt. Simpson, Weyallup, Louis Simpson, Alec Wesley, and George Meninock. Jim Goudy and Weyallup gave slightly different enumerations. While there is a slight discrepancy as to the number and personnel of the committee, the witnesses all agree that White Swan, Stick Joe, Capt. Æneas, and Capt. Simpson, known as leading men, were members. These are all dead, while Lumley and Weyallup only of the survivors have testified. This committee was empowered to go to the various tribes, each to the locality of the people from whence he sprung, and to invite the unallotted Indians of the Yakima blood into the reservation to take allotments. The Yakimas and Puyallups had for many years intermarried, and it is through this commingling of the tribes that the plaintiffs trace their ancestry back to the Yakima stock. Tom Cree of the Indian police force and a relative of the Puyallups was sent to that tribe in pursuance of the agreement, and Capt. Æneas, related to them by marriage, subsequently went to Puyallup, having the same purpose in view. Relatives of the degree referred to were invited to take up their abode on the reservation, and to participate in the allotment of lands about to be made. That

this committee was authorized to adopt those of their kinsmen who should avail themselves of the invitation thus extended, did adopt them according to Indian custom, and that this action was subsequently ratified in general council, is overwhelmingly established. Jay Lynch, formerly agent, could only say that he could not recall it, and naturally, not knowing the Indian language, he would not have fully understood the discussions. Besides, he was not the agent when the most important work of the committee was going on. The Indians relate with too much particularity of detail the fact that there was a council, that the Yakima-Puyallups were invited in, and that it was all understood and approved by Indians and officers alike, to justify harboring the least doubt concerning it. It is related that the committee held sessions and made inquiry as to the ancestry of applicants, and admitted them by vote regularly taken. The language of these people is not one which facilitates accurate speech. The Indian witnesses when not laboring under the disadvantage of having their words translated into English were under that of testifying through their own imperfect knowledge of it; but, when attention was specifically directed to the point whether there was an adoption, they invariably used the word "Yan-wah," which means "forever," and no more apt or appropriate word could be found to describe the action looking to that end. The following by John Lumley is explanatory of what they understood by the use of the word: "He says adoption means that, when he is adopted into the tribe, nobody will put him out."

It is significant that Allotting Agent Rankin, said to be a very careful, observing, and conscientious man, was not called as a witness, nor was his report produced, and that Agent Eels was not called to testify. Col. Rankin expressly advised the Yakimas that the half blood Puyallups were entitled to allotments on the Yakima reservation. He attended the councils and made investigation before he consented to the assignment of lands. We have this from Wannassey, the council interpreter, who says that 29 days were required to obtain the necessary identification of the applicants from Agent Eels before final action was taken; and it is undisputed that the latter sent a list of the names of the Puyallups for allotment on the Yakima reservation, besides, this was advised and concurred in by Commissioners Alexander, Anderson, and Renfrow of the Puyallup reserve, one of whom is still living, but was not called as a witness.

Speaking of this matter, Louis La Clair (who claims only as an heir) testified as follows:

"Q. Did they say anything as to whether or not you would be legally entitled to land over here? A. Yes; they said my children would be entitled to land over here because there was no more land to be taken up over there."
"Q. Did you believe them? A. Yes, sir.
"Q. Did you rely upon those statements? A. Yes; they were government men, and I thought that they were telling the truth."

It is asserted, and not denied, that this petitioner, in consideration of the surrender of his patent to lands on the Yakima reservation on account of having had a prior allotment on the Puyallup reservation, was thereafter to be immune from attack against the patents

issued to his children and now contested. "Nobody will touch these houses and lands" was the language by which he was thus assured. Castles, an allotting agent after Col. Rankin with whom he had the conversation, was not called to deny it. This witness on cross-examination answered as to why he gave up his allotment as follows:

"A. Just to save my childrens' land.

"Q. You hadn't made any misrepresentations, had you? A. No.

"Q. Notwithstanding that you surrendered your patent, did you? A. Yes; I say he told me if I would give up my patent the rest of the lands would be safe, and nobody would touch it, so I believed him, and I give up my patent to save the rest of the land."

This was about the time that the matter took form in the department in 1908. Thus we see that not only did the Indians act in this behalf, but those to whom was delegated the power to make segregation of community lands expressly concurred in their purposes, and actively aided in what they desired. The Indian agent and the allotting agent were fully advised of the circumstances and conditions, and having knowledge of exactly what was intended, who these people were, the right by which they claimed, they were recommended for allotment, the recommendation was approved by the Secretary of the Interior (the record so shows and the patents so recite), and thereupon patents were issued. Of themselves they bear witness to these conclusions in the most significant way. The form prescribed by the department reads:

" * * * Whereby it appears that under the provisions of the Act of Congress approved February 8, 1887 (24 Stat. 388), ———— or, ———— an Indian of the ———— tribe or band, has been allotted," etc.

The patents in all these cases, taking that in cause No. 42 as an illustration, read as follows:

" * * * Whereby it appears that under the provisions of the Act of Congress approved February 8, 1887 (24 Stat. 388), ———— Charley Ashue, an Indian residing on the Yakima Indian Reservation, has been allotted," etc.

It will be observed that the blank was prepared with the view of describing a patentee as of a certain tribe or band. This clearly shows the intention to distinguish these Indians from those of the Yakimas who had theretofore resided on the reservation. While the report of Col. Rankin has not been produced, two certificates made by him, namely, those of Samuel Ashus in his own behalf and on behalf of John Ashus, his son, dated February 24, 1894, are in evidence. They recite that the applicants for allotments therein mentioned are of the Yakima tribe, which tends, it is said, to show concealment. This is meager at best. If competent at all, it does not overcome the effect of this change in phraseology and the positive proof regarding what was done, particularly in the absence of official records or evidence contradicting the Indian witnesses.

The cases of Samuel and Charles Ashue are even stronger. On account of the death of their mother, they were brought by their uncle, Chief Æneas, to his own home in 1877, and made members of his family, and so continued until allotted lands themselves. These orphan boys thus returned to the land which by every tie of blood

and kinship they were entitled to call their own. Here their father and grandfather were born, lived, and were buried. The father was taken by the government as a prisoner to Puget Sound after the Indian War of 1855–56, which probably accounts for his connection with a tribe of that region. If his children were brought back and received with open arms, recognized as of common ancestry, and treated as members of the Yakima Nation of Indians, what stronger evidence of adoption could ingenuity invent or equity require? It was under these circumstances that plaintiffs acquired their evidences of title. Since that time many of the allottees have devoted years of toil to the improvement of the lands so set aside for their benefit. Some of them have expended large sums of money thereon. The allotments have been mostly improved, a part, it is true, through leasing. The lands were cleared of sage brush, leveled, sown to alfalfa, cultivated, resided upon, and have the customary houses, outhouses, etc. The holdings are shown to be of a present value, varying from $10,000 to $14,000 each. Where lands were leased, the leases were approved and the rental paid over to the allottees. It was not until June, 1908, that any attempt was made to disturb the plaintiffs in the enjoyment of their possessions, although Agent Lynch advised the department in 1898 of facts either expressly communicated or such as would put the reasonably vigilant upon inquiry. As to the facts, the only contentions now relied upon to justify the attempt at this late day to deprive the plaintiffs of their lands are that they were not formally adopted, and that the department did not approve of the adoption, and that it was not known that they were Puyallups. We have seen that the latter is not justified by the proofs, and the former will be presently adverted to. The thought spontaneously presses that the equities of these dependent people demand acquiescence in what they have acquiesced in unless the proposed action looking to the disturbance of their rights is required by the imperative mandate of some statute or inflexible rule of law, for it cannot be contended that an individual seeking relief under such circumstances could for a moment be heard to complain.

Whether the court is so limited we proceed to inquire.

1. The patents carry the presumption of verity. That they can only be set aside upon the most clear and convincing proof is the established doctrine of the Supreme Court. United States v. Winona & C. R. Ry., 165 U. S. 463, 17 Sup. Ct. 368, 41 L. Ed. 789; St. Louis Smelting & Refining Co. v. Kemp, 104 U. S. 666, 26 L. Ed. 313; United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384; Bank of United States v. Danbridge, 12 Wheat. 69, 6 L. Ed. 552; United States v. Maxwell Land Grant Co., 121 U. S. 379, 7 Sup. Ct. 1271, 30 L. Ed. 1211; Colorado Coal & Iron Co. v. United States, 123 U. S. 316, 8 Sup. Ct. 131, 31 L. Ed. 182. By interposing its defense, the defendant is strictly within this rule as to the degree of proof required. It is in the same situation as though it were a complainant seeking the relief which it incidentally asks by attacking those proceedings which led up to the final action taken by its officers. It is with this principle in view that an examination

will be made of the points suggested for and against the validity of the patents.

2. We thus come to consider the contention that there was no legal adoption for want of departmental approval. We have seen that there was such an adoption as the custom of the tribe recognized. No statute has been cited nor departmental rule or regulation adverted to which requires affirmative action in that behalf. It was vaguely hinted at by the testimony of Agents Lynch and Young, all of which was incompetent to establish it, even if the testimony was sufficiently definite to justify the inference. That the things done were all that was required to make the petitioners members of the Yakima Tribes the following cases attest: Hy-Yu-Tse-Mil-Kin v. Smith, 194 U. S. 401, 21 Sup. Ct. 676, 48 L. Ed. 1039; Bonifer et al. v. Smith et al., 166 Fed. 816, 92 C. C. A. 604. But, if it be assumed that official ratification was essential before adoption could become effective, it must be held that the department did ratify by acting with full knowledge of the facts; that is, knowing that these petitioners were of the Yakima blood, that they might claim allegiance with the Puyallups but were selected by the Yakimas to take allotments, and that the tribe in so far as it could had authorized the same, and had according to custom adopted them, the action taken was a ratification by the department of what the Indians had undertaken to accomplish.

3. Reliance is had upon the fact, not disputed, that the parents of these patentees were given allotments upon the Puyallup reservation. It was admitted upon the argument that no person who had there received an allotment is a plaintiff here. The claim that the allowance of the allotments under discussion was double rests upon a treaty provision with the Puyallup Indians, which reads as follows:

"The President may * * * at his discretion, cause the land, or any portion of the lands hereby reserved, or of such other lands as may be selected in lieu thereof, to be surveyed into lots and assign the same to such individuals or families as are willing to avail themselves of the privileges," etc. 2 Kappler's Indian Treaties, p. 661, 10 Stat. 1133, art. 6.

The patents issued in pursuance of this treaty, taking that of Louis La Clair as an illustration, read as follows:

"Louis Le Claire, the head of a family consisting of himself, Martha, Ellen, Louisa, Louis and Edward," etc

The contention now renewed that because the plaintiffs were named in the Puyallup patents as members of the families whose heads received them they are not entitled to allotments on the Yakima reservation was passed upon adversely to the defendant in the early stages of these causes as one of first impression. Since that time attention has been called to authorities, noted below, which fully justify the view then taken. Wilson v. Wall, 73 U. S. 83, 18 L. Ed. 727; Meeker v. Kaelin et al. (C. C.) 173 Fed. 216, and the many cases there cited.

4. Laches, estoppel by conduct, and the statute of limitations have been forcibly urged as barring any affirmative action by way of assailing plaintiffs' patents. In bringing forward this contention, the general rules that the government cannot ordinarily be estopped, and

that to invoke a limitation against it there must be express consent, have not been overlooked. This distinction has been pointed out: Where the United States cannot become the beneficiary of litigation, but the result must inure to the benefit of private individuals, the rule does not apply. Thus:

"While it is undoubtedly true that when the government is the real party in interest, and is proceeding simply to assert its own rights and recover its own property, there can be no defense on the ground of laches or limitation (United States v. Nashville, Chattanooga, etc., Railway, 118 U. S. 120, 125 [6 Sup. Ct. 1006, 30 L. Ed. 81]; United States v. Insley, 130 U. S. 263 [9 Sup. Ct. 485, 32 L. Ed. 968]), yet it has also been decided that where the United States is only a formal party, and the suit is brought in its name to enforce the rights of individuals, and no interest of the government is involved, the defense of laches and limitation will be sustained as though the government was out of the case, and the litigation was carried on in name, as in fact, for the benefit of private parties." United States v. Des Moines Navigation & Ry. Co., 142 U. S. 510, 12 Sup. Ct. 308, 35 L. Ed. 1099.

Again:

"When, in a suit in equity brought by the United States to set aside and cancel patents of public land issued by the Land Department, no fraud being charged, it appears that the suit is brought for the benefit of private persons and that the government has no interest in the result, the United States are barred from bringing the suit if the persons for whose benefit the suit is brought would be barred." Curtner v. United States, 149 U. S. 671, 13 Sup. Ct. 985, 1041, 37 L. Ed. 890.

It is disclosed that the Yakima Indians are making no objection to sharing their lands with the plaintiffs. Since they expressly invited participation in the division of their reservation, it would be highly inequitable to permit them to dispute the rights of their kinsmen. The defendant is not concerned with protecting their interests. If the government should succeed in canceling the patents, it would only inure to the benefit of the Yakima Tribes and not to the United States. Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 23 L. Ed. 634. The Supreme Court has given effect to the allotment statute by holding that the issuance of the preliminary patents conferred citizenship upon the patentees and terminated the relation of guardian and ward theretofore existing. Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848.

Until the final patent issues, the United States holds such lands as trustee, and the right to institute suits during that period may sufficiently rest upon its proprietary interest, in that it may protect the lands ultimately to be conveyed against intrusion, spoliation, or clouded title. Whether the right may rest upon any other ground need not be discussed. But the defendant is not here prosecuting a suit in protection of the lands nor claiming as guardian, but is pursuing a strictly adversary proceeding against its own citizens. Therefore it is that the provision "that suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents" (Act March 3, 1891, c. 561, § 8, 26 Stat. 1099 [U. S. Comp. St. 1901, p. 1521]), must be

held to apply because the United States is not "proceeding simply to assert its own rights and recover its own property." The amendatory act of April 23, 1904, supra, authorizes the Secretary of the Interior to rectify and correct mistakes and cancel patents during the whole of the trust period for the defects therein expressly mentioned; that is, where a double allotment has been made to an Indian, by an assumed name or otherwise, or where a mistake has been made in the description of the land, neither of which is present in the cases at bar. It must be held that it was not intended to render the general statute of limitations inapplicable by retaining jurisdiction over the lands during the whole of the trust period except in so far as it applies to the express authority there conferred; and this even if the proviso, which reads as follows: "That no conditional patent that shall have heretofore or that may hereafter be executed in favor of any Indian allottee, excepting in cases hereinbefore authorized, and excepting in cases where the conditional patent is relinquished by the patentee or his heirs to take another allotment, shall be subject to cancellation without authority of Congress"—does not altogether exclude the power of the Secretary of the Interior to act upon patents issued prior to the adoption of the act. In this view, the contest being adversary, the parties at arms' length, so to speak, the relation of guardian and ward having been transformed into that of sovereign and citizen and there being no express authority of law which authorizes the Secretary to deal with such cases, in its cross-bill the United States is in the attitude of prosecuting suits against citizens for cancellation of patents beyond the time when it may wage controversies in that behalf.

Counsel has called attention to the recent holding of this court in United States v. Northern Pacific Railway Company et al.[1] that the limitations statute does not apply where the government is suing on behalf of Indian wards, but, to put it most strongly for the defendant, the cross-bills seek relief against its wards, or, if there can be any ground to contend under the recent decisions of United States v. Sutton (D. C.) 165 Fed. 253, and United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195, that the rule laid down in the Matter of Heff, supra, has been modified, then it is against citizens of the United States, and in either view a different rule must prevail.

5. The contentions here made are in their nature equitable and the answers pray for cancellation, a remedy also of equitable cognizance. At the time these transactions occurred the defendant was guardian of the plaintiffs. That relation requires the exercise of good faith. We have seen that the charge that plaintiffs were guilty of fraud in concealing the facts has wholly failed of proof. The minors, not even shown to have made any representation, were too young to conceive the perpetration of fraud or to have appreciated the resulting consequences of misrepresentation. They are therefore asked to answer, as counsel for plaintiffs has said, for the sins of the fathers. But the fathers practiced no machinations. They

---

[1] Pending on appeal in Circuit Court of Appeals.

sinned not. The slight differences in the spelling of names, pointed out as evidence of concealment, are not substantial variances. They are within the rule of idem sonans. It is common knowledge that mistakes often occur in the spelling of proper names. They would more frequently occur with the whites if, not knowing how to spell their own names, they were compelled to rely upon the uncertainties of communication through word of mouth and the unaccountable caprices of those who, being fancy free, carelessly wander through the alphabet. Referring to this, one of the Ashues testified as follows:

"A. It may be some educated fellows wanted to put it the other way.
"Q. You put your name first as Ashus, didn't you? A. A-s-h-u-e, that is the way my school teacher spelled it, and ever since I spelled it that way."

Under this head it has been suggested that executive action ought not to be interfered with. Certainly when within the scope of delegated powers this is the rule. The courts ought to uphold, indeed, are compelled to uphold, such action whenever brought in review. Giving full effect to the rule, we find that all these questions of fact were passed upon when the assurances of title were given out. They cannot now be disturbed by the same or other officers with no greater authority. There ought to be a time somewhere in the course of allotment proceedings when a trustful and ignorant people could find repose from further interference. We have seen that there was no mistake of fact, that at best there was only a mistake of law, and, giving the answer its broadest scope and accepting it as one presenting this issue, it is to be observed that courts do not ordinarily relieve against mistakes of law (16 Cyc. p. 73, note 36), although under peculiar circumstances relief will sometimes be granted against such a mistake. Griswold v. Hazard, 141 U. S. 260, 11 Sup. Ct. 972, 999, 35 L. Ed. 678. But there was not even a mistake of law. When the officers upon whom devolved the duty of allotting lands exercised their discretion, in the absence of fraud or excess of jurisdiction, the executive branch was thereafter concluded from disturbing its own action unless by express statutory authority; and acts attempted without authority, as here, are proper subjects of inquiry in the courts. Garfield v. United States, 211 U. S. 249, 29 Sup. Ct. 67, 53 L. Ed. 176.

Thus it will be seen that, if every other consideration be laid aside, equities which demand enforcement under strict rules of the law command the court to uphold proceedings the validity of which the patents imply. What could be more natural—more human—than for this primitive people—this dependent and fast decaying race—to take its last stand against encroachment which began upon the Atlantic and will finally end upon the Pacific with their extinction to retain as far as possible a community of their own, uncontaminated by association with the whites? We find the motive in their affection and hospitality. This was quaintly expressed by Weyallup as follows:

"A. Yes; we get together some place, us Indians all the time; that is, we feed each other, and don't charge them a cent."

There is no proof here to justify a court of equity in moving against patents issued by the department with complete jurisdiction and after due consideration. A quotation from the Supreme Court is a fitting conclusion of this opinion.

"The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons equally subject to the same laws." Choctaw Nation v. United States, 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 315.

The plaintiffs must prevail, but not to the extent prayed for in their petitions. The statute from which the court derives its authority does not seem to contemplate an injunction against the United States, and, indeed, if it did, it is difficult to see how a decree of that character could be enforced, particularly in the absence of its officers as parties defendant.

Decrees will be entered in accordance with the views herein expressed. Objections for incompetency to the admission of correspondence offered in evidence and to the testimony of witnesses Lynch and Young concerning rules of the department in regard to adoption, interposed by plaintiffs' counsel, will be sustained, but all other objections made by either side will be overruled, nothing prejudicial having been elicited