## DANNEN GRAIN & MILLING CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 12113.

Circuit Court of Appeals, Eighth Circuit.

Aug. 19, 1942.

H. Templeton Brown, of St. Joseph, Mo. (R. L. Douglas and R. A. Brown, Jr., both of St. Joseph, Mo., on the brief), for petitioner.

Winthrop A. Johns, Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, National Labor Relations Board, Laurence A. Knapp, Associate Gen. Counsel, National Labor Relations Board, Ernest A. Gross, Asst. Gen. Counsel, National Labor Relations Board, and Louis Libbin and Robert E. Mullin, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before STONE, THOMAS, and JOHNSEN, Circuit Judges.

STONE, Circuit Judge.

This is a petition to review a portion of an order directed by the Board against petitioner. The concise substance of the complaint before the Board consisted of two parts, as follows:

First, that petitioner had, since on or about June 30, 1939, interfered with, restrained, and coerced its employes by making remarks derogatory to the Union (Flour, Cereal, Feed Mill and Grain Elevator Workers, Federal Union No. 21008), by spying upon the Union activities of its employes, by discriminatorily transferring and demoting employes who were Union members, by threatening discharge of employes on account of Union affiliation, by withholding employment from former workers at the plant because of their Union affiliation, and by requiring applicants for employment to divulge their union affiliations.

Second, that petitioner had, on or about December 5, 1939, discriminatorily demoted and, on or about February 21, 1940, discriminatorily discharged Edmond S. Fry because of his membership in and activities on behalf of the Union and, for the same reason, has at all times since refused to reinstate him. The examiner found:

(1) That petitioner had interfered with, restrained and coerced its employes in the exercise of their rights guaranteed in Section 7 of the Act, 29 U.S.C.A. § 157, by the use of certain objectionable employment application blanks and by statements of the superintendent of the plant (Albert J. Monach) to two employes (Fry and Kerns), in July, 1939, to the effect that "he wouldn't have no damned union men down there telling him what to do," and his statement, about October 31, 1939, made in the mill room at the plant in the hearing of certain employes, that "they were not going to have any union."

(2) That there was no discrimination with respect to the hire and tenure of employment of Fry or conditions of his employment either at the time of his demotion or at the time of his discharge.

Therefore, the examiner recommended a cease and desist order from interfering with, restraining or coercing the employes in the exercise of their right to self-organization and to bargain collectively; and recommended dismissal of the complaint in so far as it concerned the demotion and discharge of Fry.

The Board followed the recommendations as to the cease and desist portion, but found that the discharge of Fry was discriminatory and required his reinstatement and reimbursement.

The petitioner complied with all portions of the order except that requiring reinstatement and reimbursement of Fry. The only broad issue presented by this petition to review is the existence of substantial testimony to support that portion of the order requiring such reinstatement and reimbursement. It is undisputed that Fry was demoted, about December 5, 1939, by being transferred to a different character of work at a lower wage; and that he was discharged on February 21, 1940. The contention of petitioner is that the evidence does not support the finding of the Board that such demotion and discharge were discriminatory but does show that such actions by petitioner were for cause.

Prior to July 1, 1939, a partnership conducted the business of manufacturing feeds for animals and poultry at St. Joseph, Missouri. The partners were H. L. Dannen, his son Dwight L., Alma B. Dannen and Arlene Mannschreck. At the same time H. L. and Dwight L. Dannen owned fifty per cent of the stock in the Dannen Soybean Corporation, a company engaged in processing and selling soybeans. On June 30, 1939, the assets of the partnership were sold to the corporation and the name of the latter changed to Dannen Grain and Milling Company. On July 1, 1939, H. L. Dannen, Dwight L. Dannen and Arlene Mannschreck purchased the other fifty percent stock interest in the corporation. After these transactions the operation of the feed business and that of the soybean business were consolidated although these operations were carried on in separate manufacturing plants suitable to the particular business. The active head of this business was H. L. Dannen, president of the company. Albert J. Monach was superintendent of the plant. William C. Crabtree was foreman of the feed plant. Edward Peek had a minor supervisory position variously described as a "straw boss" or as night foreman "part of the time." While the number of employes in the feed plant had some variations, yet the average seems to have been about twenty-one for some months prior to July 1, 1939.

Prior to April 14, 1939, the employes of the feed plant had some sort of an organization which operated through a committee, of which Edward Peek was a member. On the above date the local representative of the Union notified petitioner that seventeen of its employes had designated the Union as their bargaining representative and he requested a conference for that purpose. Dwight L. Dannen wrote the representative suggesting a time for such conference and on the same day wrote a letter to Peek (as "a member of the committee that our employes authorized to bargain with us, and with which committee a contract of employment was drawn up, signed and put into effect"), stating that a letter had been received that the Union was authorized to represent some of the employes and asking if the committee still represented the employes or if the employes had authorized the Union to represent them. Peek circulated and secured the signatures of seventeen employes to the effect that they did not want the Union

to represent them. The lists of employes set forth in the letter from the Union representative and appearing on the paper circulated by Peek each show seventeen names of which thirteen are in common. There is evidence that at least some of the employes who signed the Peek paper did so under fear of losing their jobs because of statements by Peek. On receipt of the Peek paper, Dwight L. Dannen wrote the Union representative that he thought the representative did not represent a majority of the employes. On May 12, 1939, the Union representative filed a charge with the Acting Regional Director of the Board against the company based on the circulation of the Peek paper and upon the alleged discriminatory discharge of John Gillenwater[1] on April 15, 1939. There were conferences between the Union representative and Dwight L. Dannen concerning the complaint with the results that an oral agreement was reached and the Union representative withdrew the charge without prejudice. The main feature of this settlement agreement seems to have been the posting by petitioner of a notice setting forth the rights of employes under the Act and stating that all employes of petitioner were free to do as they wished without interference, domination or influence by petitioner. Nothing further seems to have been done by the Union to enforce any rights of representation.

The next occurrence has to do with the re-employment on July 1, 1939, necessitated by change in ownership. Late in June, a form letter was sent to every employe of the plant informing him of the change in ownership and that, if he wished employment under the new ownership he should make an application on blanks which could be secured from Mr. Monach and which the applicant was to fill out "as completely and carefully as possible and return it to him at once." This application was in a form which had been used by the partnership for a year or so prior to its absorption by the corporation. The application was quite extended and detailed in its inquiries as to a number of matters concerning the health, marital and financial situations and educational qualifications of the applicant. Also, it contained the following questions:

"Of which union have you been a member ———. Are you now a member———. What are the monthly dues ———. Have you ever been out on strike ———. When ———. Number of men on strike ———. At what company ———. Have you ever worked in any plant or with any company while a strike was in progress against them ———. Date ———. What company ———. What work did you do ———."

Apparently, all of the regular and extra men made such applications. All were re-employed except four: Edmond S. Fry, Ray Kerns, John L. Gillenwater and Carl Pennington.

On July 18th, the Union filed a charge with the regional officer alleging discrimination against the above named four employes. Later in the month Fry and Kerns called upon Monach to ascertain why they had not been re-employed. Monach told them that he didn't do the hiring but the firing; that the hiring was done at the office and they would have to go there and see. There was further talk during which Monach spoke of Kerns as having him up before a "bunch of racketeers" and in answer to a question as to whether he was referring to the Labor Board he said "I guess so if you want to take it that way." Thereafter, a settlement was reached between the Union and petitioner wherein, although expressly denying any discrimination against the men, the petitioner agreed to take them back and pay them for lost time. Petitioner claimed that it had not rehired the four men because it needed only a smaller force at the feed mill since it could transfer men there from the soybean mill. The evidence shows that men were so transferred and that no one had ever been employed to replace any of these four men. As a result of the above agreement the charge was withdrawn and the four men returned to work October 31, 1939. October 28, 1940, the present (third) complaint was filed.

The history of Fry is as follows: He was employed by the company from March 7, 1936, until June 30, 1939, when the partnership ceased. He was not re-employed by petitioner on July 1st, but was reinstated on October 31, 1939, as a part of the agreement with the Union representative

---

[1] As to Gillenwater, his testimony is that he did not put in any charge against petitioner but that he was working as an extra man and was laid off April 15th but not discharged. At some indefinite date after April 15th, he went back to work, being again laid off on June 22, 1939. There is no evidence that the later settlement agreement had anything to do with Gillenwater.

in connection with the second complaint filed with the Board. From that time he worked until his discharge, on February 21, 1940. He was hired as a "sack sewer" but when not busy at that did general work which included "loading and unloading cars, loading and unloading trucks, waiting on trade, packing feed in sacks, getting them in stock, piling the stock up high, and kept it clean." While at the plant he worked with various machines, operated by electricity, such as a sack sewing machine, a packing machine (to pack feed closely in sacks) and a pellet or hunket machine.

His name was among those who joined the Union in April and among those listed by the Union representative as authorizing its representation in the letter of April 14th. Also, he signed the paper circulated by Peek stating that he did not want the Union to represent him. He filled out an application for employment by petitioner wherein he stated that he had not been and was not then a member of any union. When he was not employed he was given or offered a service letter, dated July 26, 1939, by H. L. Dannen wherein was stated the discontinuance of the business of the partnership and that "in the reorganization, all of the employes of the two companies were not needed to conduct the business and Mr. Fry was among those not employed by the corporation. I have known him personally for practically all of the above period [March 7, 1936 to June 30, 1939] and recommend him to anyone who is in need of a steady worker." For some reason which is not quite clear, Fry requested a service letter in November, 1939, in response to which H. L. Dannen wrote him, on November 25, 1939, that the letter was written and "we shall be glad to have you call at the office, 412 Felix Street, for it." Fry failed to call and, on December 2nd, Dwight L. Dannen wrote him "several days ago you requested us by letter to furnish you with a service letter. We have written this letter for you and it is here at the office. Please pick it up at your convenience." There is some confusion in the testimony concerning this request for a service letter and the above resultant correspondence. It is strange that Fry would be requesting a letter of this character at a time when he was working for petitioner (after reinstatement) and when no trouble had arisen with him. It may be significant that Kerns

had been discharged on November 14th, which was evidently before Fry had requested this service letter which would seem to be useful to him only if he had in mind quitting his employment.

The first difficulty with Fry occurred the very early part of December, 1939, in connection with his operation of the motor for a sewing machine. Fry testifies that he went to work for the petitioner in March, 1936, as a sack sewer and that "they didn't have anyone who could sew and that was why they hired me." He further testifies that he "did most all of the sewing" and that he continued that work, along with general work when not busy sewing, until June 30, 1939, when the partnership ceased. Therefore, we must conclude that he was thoroughly familiar with the operation of the sewing machine and the motor which propelled it. On this day in December Fry had been using the sewing machine. Some time after he had left it, Crabtree, from the floor below, smelled a hot motor and tracing it up found the sewing machine motor smoking with the switch in the "in" position. Crabtree threw the switch out and later said to Fry "do you know you left the switch on on that motor up there? It is smoking now." To which Fry answered: "I thought I turned it off." This motor was burned to the extent that it had to be repaired. Crabtree reported this occurrence to his superiors.

The next incident has to do with the operation, by Fry, of a motor running a hunket machine three or four days later on the 4th or 5th of December. This machine was located on the second floor with a raised platform above it from which Fry was feeding matter into it. From this platform the machine was visible and there was nothing to shut off from him any smoke or odor arising from the motor. Another employe (Adams) had been operating this machine and Fry was relieving him while Adams went to lunch. The operating motor became over-heated. This motor was on the floor and not many feet below Fry. His testimony is that the motor did not emit any smoke or odor until an instant before the machine stopped. While admitting that when a motor commences burning it has a very strong odor, he testifies that he did not notice this until directly after the machine stopped. He did not turn the motor off and does not know who did. The testimony of Crab-

tree is that he was in the second story of another building "across the tracks from the building in which the hunket machine was" when he heard the motor laboring. This kept up for about ten minutes when he concluded that Fry was pulling the motor hard and was not going to cut down the feed to the machine at all. Crabtree then went over and found the motor smoking and Fry up on the platform putting feed in. At that time the motor was still running and Crabtree shut it off himself. This motor was damaged and had to be repaired. The next day after this occurrence Fry was called into the office of Dwight Dannen, who told him that he didn't consider him competent to handle the machine and was going to have to demote him and put him on nights where "I wouldn't have any machinery to run", at a reduction of two cents per hour in pay. On this occasion Dannen testifies that he pointed out to Fry the seriousness of fires and the hazard to the mill and machinery and the cost of being shut down and told him that he would keep him on and put him on different work with a reduction in pay.

The third incident was with a chicken feed mixer machine. The work upon which Fry was engaged was trucking soybean meal and pouring it into a conveyor. When there were lumps in the meal he would run the machine to break them up. On the night of February 20, 1940, Fry was doing this work. It was a damp evening and there were a good many lumps in the meal. He testifies that he would use the machine only when necessary to break up these lumps and that a motor was used to operate that part of the machine and for no other purpose in connection with his work. He testifies that he ran the motor only when he needed it and did not leave it running when he went out for a truck load of meal. He had gone to work at seven o'clock in the evening. Some time between two and a quarter of three in the morning, he testifies, he had just come in with a load of five sacks and set it down. The motor was running at the time. He opened one sack and started to dump it when the night watchman came in and said "there is a fire in the basement." So he ran down and put it out. The fire was from the motor and came out some sixteen inches around it. This motor was located on the floor below which he was working. There were two small openings in the floor which were, at that time, covered with sacks. He smelled no smoke from the heating motor and did not know of any trouble until warned by the watchman. The motor was considerably damaged and had to be repaired at a cost of forty-four dollars. There are three theories in the evidence as to what caused the motor to burn. One of them is that it was caused by "phasing" the switch (this seems to mean that unless the switch is pushed all of the way into the "in" position it will cause trouble). Another is that certain bearings in the motor were badly worn and might have been the cause. A third has to do with leaving the motor running unnecessarily. Whether the fire was caused by some one or combination of these three is entirely uncertain in the evidence. Obviously, Fry could not be chargeable with fault in so far as the bearings were concerned. As to the "phasing", the switch was enclosed in a box with a protruding switch handle. While Fry could not see the switch points inside the box and in that way know whether the switch had been pushed clear in, he could easily have known when he had pushed the switch handle as far as it would go. However, there is no evidence to show that he knew the effect of not pushing the switch handle entirely in. As to leaving the motor running, there was no one present except Fry and he says that he did not do this. However, he does testify that he had just come in with a truck load of meal and was just opening a sack when warned of the fire and that the motor was running. From this an inference might well be drawn that he had left the motor running when he went after this truck load of meal although there is no evidence except as just stated. We doubt if the evidence is sufficient to show any fault in Fry except the above inference. As to whether he could have smelled the heating motor before he was warned of its being on fire, he testifies positively that he did not and that there was no smoke until he put out the fire. The latter part of this statement seems entirely incredible for this fire was caused by some sort of friction; there is, ordinarily, a space of time between initial heating and final combustion, through friction; and, in a motor, a strong, pungent odor is given off before the ignition point is reached. In fact, Pennington testified that some time after Fry had been discharged this motor heated while being operated by another workman and that the odor was quite distinct. When the foreman discovered the situation, he

told Fry that they would have to shut down for the night. Later in the day Dwight Dannen discharged Fry.

The undisputed evidence is that, during a space of two years up to this hearing, only four motors in the entire plant had been over-heated—three being the above by Fry and one, some weeks after Fry's discharge, by Adams.

Conclusions.

In the above outline of evidence we have tried to state the continued story with sufficient but not entire completeness. We have not thought it necessary to set out some of the statements attributed to Monach or to Crabtree showing their hostility to unionization of the plant nor as to their determination to get rid of union men because our conclusions, from the above stated and the just mentioned omitted evidence, are that there is substantial evidence of a hostile attitude toward unionization— somewhat upon the part of the Dannens and more pronouncedly on the part of Monach and of Crabtree, who were the active supervising officers.

When it comes to testing the manifestation of this attitude against its employes, there is no contention of such as to any but Fry, Kerns, Pennington and Gillenwater.

The first alleged manifestation of this attitude as to those men is in their non-employment when petitioner began business on July 1st. There is no evidence to justify belief that petitioner was acting improperly in reducing its working force. The matter relates to its selection of these particular four men in making that reduction. The items of evidence which seem to bear upon this failure to employ consist of the following. The list of names sent by the representative of the Union on April 14, 1939, to the company as desiring representation by the Union, included all four of these men. The list of names on the paper circulated by Peek, to the effect that they did not wish such representation, contained those of Fry and Pennington but not Kerns and Gillenwater. Another matter has to do with the entries by each of these four men on their employment application blanks. Photostatic copies of the applications of Kerns, Fry and Gillenwater are in the file. The application of Pennington is not. Gillenwater and Kerns stated in their applications that they had been and then were members of the Union. Fry stated that he was not. It is a fair inference from the testimony of Pennington that his application did not show him to be a member of the Union. Although the new employment by the corporation began on July 1, Pennington did not file his application until July 12, even though he received the notice of change in ownership which stated "all terms of employment will cease on June 30" and which requested applications to be returned "at once". Also, there are statements by Monach or Crabtree showing their attitude toward the Union but these statements are general in character and were not directed to any of these four men in any individual way although some were spoken in their presence and others to them. There is no evidence that any of these men had been particularly active in the Union or were officers or, for any other reason, should have been singled out by petitioner. There is no testimony that less competent employes had been retained. The only one of these four men who might be regarded by petitioner as offensive on account of something it might have thought he had done was Gillenwater, whose alleged discharge (in fact, a temporary lay-off) had been made one of the grounds for the first charge filed by the Union, but Gillenwater testifies that he had nothing to do with this charge and the evidence shows that he has always been particularly well treated by the petitioner. There is no substantial evidence that these four men, or any one of them, were not re-employed (in July, 1939) because of Union activities or connections.

The next matter has to do with treatment of each of these four men *after* their reinstatement on October 31, 1939. An outline of this treatment of Fry is stated above. Similar outlines as to Kerns, Gillenwater and Pennington are set forth in footnote (2).[2] There is evidence of a general statement by Crabtree to the effect that

---

[2] The experience of each of the three men (other than Fry) since re-employment has been as follows. Kerns was discharged becausee of an altercation with Crabtree arising out of Kerns' objection to the amount of work he was expected to do. Crabtree told him that other men were doing that amount of work when Kerns called Crabtree a "damned liar", whereupon Crabtree knocked him down. A few minutes later Kerns struck Crabtree over the head and

he would put so much work upon the Union men that they would quit. Kerns thought too much work was being put upon him and that caused the above altercation with Crabtree resulting in his discharge. There is no substantial evidence that too much work was put upon Kerns and there is no substantial evidence that his discharge was caused by anything than his cursing Crabtree and the fight which resulted. Also, there is no substantial evidence of any undue amount of work being put upon any other one of these men. As to Gillenwater, his own evidence, which is not disputed, is that he was not only not discriminated against but was actually given preference in employment over other "extra" men. The experience of Pennington (outlined in footnote 2) reveals a peculiar situation. It shows two complaints against him which were communicated by one of petitioner's counsel to the Union representative. The first of these involved doing his work in an improper manner, and the second, loitering which affected the morale of other employes. As to the first of these, no complaint had been made by his immediate supervisor, Crabtree, but there is evidence by Pennington that "at that time, or shortly before", Dwight Dannen watched him stacking feed and said "you should be fired." It is quite probable that this first complaint arose from Dwight Dannen's observation. There is no explanation of the source of this complaint beyond the inference that it must have been communicated to petitioner's attorney by Dannen. The peculiar feature of both complaints is that they were not followed up by petitioner. Dannen apparently thought them serious enough to have the attorney call up the Union representative about each of them. That representative did the proper thing of suggesting, in each instance, that the matter be investigated and there be a consultation as to the merits of the complaints. Petitioner proceeded no further. The circumstance that both matters were taken up with the Union representative would, standing alone, be strong

---

on the hand with an iron bar. No question is raised here as to the discharge of Kerns not being justified as for cause.

As to Gillenwater, there is no evidence of any discrimination but, on the contrary, his own evidence shows that he has been given preference in employment over other "extra" men.

As to Pennington, the situation is that Mr. Douglas, a member of the law firm representing petitioner, called up the Union representative, about January 15, 1940, stating that Mr. Dannen had complained that Pennington had not been piling the sacks of feed properly, that the piles were falling over and that he wanted to discharge him. The representative suggested that he would contact Pennington and see if anything was wrong and, if so, would try to get the matter satisfactorily adjusted. Douglas said this would be satisfactory and that Pennington would continue on until they had talked further. The representative took the matter up with Pennington, who seemed surprised at the complaint, and told Pennington to go to his "boss" and tell him of the complaint, ascertain in what way his work was unsatisfactory so that he might adjust it and state that he desired to do the work the way the company wanted it done and then to report back to him (the representative). Pennington spoke to Crabtree, who said that he had made no complaint as to his work, and this was reported back to the representative, who communicated it to Mr. Douglas, who said that he would take the matter up with Mr. Dannen and call the representative back. Pennington testified that about or shortly before the time he spoke to Crabtree, Dwight Dannen saw him stacking feed in the warehouse, said to him "you should be fired", and walked out. Douglas made no further communication to the representative until three or four weeks later when he called saying that "Mr. Pennington is causing us trouble again." Also, he then stated that he had another complaint which was peculiar and at which he was surprised himself. He stated this complaint to be that "Mr. Dannen tells me that the efficiency of the mill has dropped to a very low level; that the other employes, other than Pennington, state that if Pennington doesn't have to do his work then they wouldn't work, and, consequently, they drop in efficiency." The representative stated that this seemed a very unusual complaint and suggested that they call a meeting of all concerned and see what was the matter. "If our member is at fault, we will assume the blame and see if it can be rectified. And, on the other hand, if the company is at fault, we would appreciate that they discontinue harassing our members." Douglas said "he would take that matter under consideration, would confer further with Mr. Dannen and would let the representative hear from me." There was never any further communication with the representative as to Pennington.

evidence of fairness upon the part of petitioner. However, the failure to go forward after the Union representative expressed a willingness to do so in a fair way throws strong suspicion upon the entire situation and leaves it questionable. Unless petitioner thought there were good grounds for the complaints and wanted to treat the matter fairly, why should it have brought the matter to the attention of the Union representative? If that was its attitude, why did it not proceed when that representative proposed a normal and fair method of determining the soundness of the complaints? The evidence is entirely barren of any explanation why petitioner did not so proceed. Since such explanation was entirely in the knowledge of petitioner's officials, this absence of proof throws such suspicion upon the situation as to Pennington that we think the Board was justified in drawing an unfavorable conclusion. Our conclusion as to the above three men is as follows: There is a total lack of evidence of any discrimination against either Kerns or Gillenwater because of Union activities; an inference is justifiable that petitioner had some reason for desiring discharge of Pennington other than his incompetence and that such reason was that it was on account of his Union affiliation is justified by the evidence.

■■ As to Fry. Whatever may have been the attitude of petitioner toward Union men in general and whatever inferences may be drawn as to its desire to be rid of such, the only evidence that it put such desire into active operation is as above stated concerning Pennington. Both the general attitude of petitioner and its particular attitude as manifested toward Pennington, would justify, if not compel, a close scrutiny of its discharge of Fry. In short, a very convincing case of discharge for cause would have to be made to make unreasonable a conclusion that his discharge was because of Union affiliation. The law protects the employe only in respect to his entire freedom in joining or not joining any labor organization he desires and thus selecting his bargaining representative. Discharge of an employe because of union sympathy, membership or activity is interference with such liberty. The law does not affect the right of the employer to discharge any employe for reasons other than interference with the above liberty of the employe. An incompetent employe is given no protection by the law

against the results of his own incompetence. The difficulty in the practical situations of discharge which arises is to determine whether the discharge is for cause or for union activities not approved by the employer. Where there is substantial evidence justifying a conclusion that the employer is opposed to organization of his employes by any or a particular union, and especially where (as here) there is some evidence of a manifested desire to be rid of employes who become union members, we think the practical application of the law, to make it effective within but not beyond its limits, is to hold a discharge improper unless the evidence is very convincing that a finding of improper discharge is arbitrary. We proceed to apply that method to the facts here.

■ Fry must have had some practical familiarity with motors operating the machines in this mill because he had worked on them for about three years and eight months before the first of the occurrences. He testifies he was employed by the petitioner as a sack sewer because the partnership "didn't have anyone who could sew." During the entire time of his employment up to the trouble with this sewing machine motor, about the first of December, 1939, his employment remained the same. There is no basis whatsoever in the evidence for any other conclusion than that he was transferred from the sack sewing because of this trouble about the motor. Whether he was at fault or not, it is clear that the petitioner thought he was and that its action was based on that belief. If petitioner had desired to get rid of him because of Union membership, this occasion would have afforded an opportunity. Instead of doing so, it transferred him to other work, on the hunket machine, with no reduction in pay. Within three or four days after this transfer and while working with the hunket machine, the motor operating that machine was injured. Under the evidence, it is difficult to explain that occurrence except through oversight of Fry. But whether he was then in fault or not, there is no basis for any conclusion than that petitioner sincerely believed that he was. When such occurrences were very unusual in the plant and when two of them had happened on different machines operated by Fry, an experienced man, in less than a week, there is no basis in the evidence to conclude that petitioner was not honest in its belief that Fry had

manifested an inability or unwillingness to protect its equipment in connection with his operations thereof. Each of these two occurrences involved a fire hazard to the plant besides the immediate injury to the machine. Had petitioner a desire to get rid of Fry because of his Union membership, this second occurrence, in connection with and so soon after the first occurrence, would have afforded a golden opportunity to discharge him. Instead of doing that, he was again transferred to other work. This other work involved only occasional use of motors by him. His main work would be the trucking of soy meal and pouring it into the mixing machine. Only when lumps were encountered in that meal would he use the motor to operate that part of the machine which would break up the lumps and then only so long as necessary to break them up. This transfer involved a decrease in pay from forty-six to forty-four cents an hour. There is no dispute that when this transfer was made he was told why and that the fire hazard was explained to him. This third occurrence went further in its results than either of the other two. The motor actually caught fire to the extent that flames surrounded it for about sixteen inches. The danger to the plant from such an occurrence is quite obvious. Thus the situation as to Fry is that he had worked on the sewing machine without any difficulty with that motor for more than three years when the first occurrence happened; transferred to the hunket machine, a similar occurrence happens in less than a week; transferred to employment where his use of motors was only occasional and for brief periods, the third occurrence happens with a decided menace to the safety of the plant. These were three out of only four such motor troubles within two years at the plant. In the face of this entire situation it cannot be fairly concluded from anything and everything in this evidence that the Union membership of Fry had the slightest rela-

tion to his discharge. His discharge was for cause and for very good cause.[3]

The order of the Board should be modified by striking therefrom all provisions touching the reinstatement and reimbursement of Fry.

JOHNSEN, Circuit Judge (dissenting).

The sole question is whether the Board was justified in inferring that Fry's union membership was a proximate factor in his discharge.

The record clearly supports the Board's findings that the employer had displayed bitter hostility to the attempted unionization of its mill; that by its efforts it had succeeded in breaking the force of the union in the plant; that there were only four employees, of whom Fry was one, that continued to wear union buttons at their work; that, at the time the business was converted from a partnership into a corporation, all of these four men were refused re-employment; that it was only after charges had been filed with the Board that the employer agreed to give them back their jobs; that shortly thereafter some of the employees, while Fry was present, were again told by the superintendent of the mill that "they were not going to have any union"; that, of the four union employees, one merely worked part time; that the second was discharged for insubordination within a few weeks after his reinstatement; that, as to the third, the employer purported to complain to the union about the slowness of his work, but when the union suggested a conference to discuss the matter, the employer displayed no further interest; that Fry, the fourth union man, was discharged within a week or two thereafter; and that the hostility of the employer to union organization and membership had definitely continued down to the time of Fry's discharge. Other facts that entered into the tapestry of the labor controversy are fully set out in the majority opinion and need not be repeated here.

[3] The Board found that these four men (Fry, Kerns, Pennington and Gillenwater) were the only ones wearing Union buttons around the plant. Fry testified there were four, other than himself, who did this.

Also, the Board found that these four men were the only Union men left after April, 1939, when the letter to the company was signed wherein was stated that the signers did not wish the Union to represent them. This could not be true because there were four Union men (including Kerns and Gillenwater) who never signed this letter while Fry and Pennington did sign. At least, there must have been six remaining Union men made up of Fry, Kerns, Pennington, Gillenwater, James Peek and Thomas Young —Peek and Young being two of the four Union men who did not sign. Peek and Young were retained although they did not sign the letter of April, 1939.

**330**

I think that, on these facts and circumstances, it must be held that there was evidence to support the Board's conclusion that Fry's union membership was one of the prompting motives for his discharge. It may be conceded that Fry's operation of the three motors which burned would be a sufficient justification for his discharge, if the employer fairly and honestly believed that the fires were due to his carelessness, or that his failure promptly to discover them manifested such indifference or lack of aptitude as to constitute an unwarranted hazard to the mill property. But this justification would be unimportant, unless it could be conclusively said to have been the sole reason for the discharge. If the discharge was in any proximate degree motivated by the labor controversy, the Board had the right, and indeed it was its duty, to hold the employer to his responsibility under the Act.

Motive is an intangible thing and indeed frequently an elusive one. The probing of the intangibles in a labor controversy is exclusively a function of the Board. The recent case of National Labor Relations Board v. Nevada Consolidated Copper Corporation, 316 U.S. 105, 62 S.Ct. 960, 86 L.Ed. 105, reversing 10 Cir., 122 F.2d 587, has again clearly emphasized the judicial limitation to re-examine inferences with respect to the motive for discharges or refusals to re-employ, where the evidence before the Board has presented a probeable channel.

I am convinced that, where an employer has undertaken to combat the union organization of his plant, and where he has evidenced his desire to get rid of a particular employee because of union affiliation and activity—as the employer did here, in refusing to give Fry back his job at the time the partnership was converted into a corporation—and where he subsequently discharges such employee while the union controversy is still flaming or smoldering, the courts have no right to set aside the Board's inference and conclusion that the discharge was motivated by an unlawful purpose connected with the labor controversy, even though the evidence may show a sufficient justifying cause for the discharge, if there had been no attempt also to serve an unlawful purpose under the Act. The responsibility for a correct decision as to motive in such a situation is exclusively the Board's.

I think the Board's order should be enforced.