NATIONAL LABOR RELATIONS
BOARD
v.
INJECTION MOLDING CO. et al.
No. 14889.

United States Court of Appeals,
Eighth Circuit.

March 9, 1954.

Rehearing Denied April 5, 1954.

Harry L. Browne, Kansas City, Mo. (Joseph J. Kelly, Jr., Kansas City, Mo., on the brief, Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel), for respondent, Injection Molding Co.

Max H. Frankle, New York City (Philip J. Ruffo, New York City, was on the brief), for respondent Union, Local No. 161.

Owsley Vose, Washington, D. C., (George J. Bott, Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Nancy M. Sherman, all of National Labor Relations Board, Washington, D. C., on the brief), for National Labor Relations Board.

Before SANBORN, JOHNSEN, and COLLET, Circuit Judges.

COLLET, Circuit Judge.

The Respondent Company, which will be referred to hereafter as the Respondent [1], employed somewhat less than fifty persons, mostly women, in its business in Kansas City, Missouri. It had a collective bargaining agreement with Local 710 of the CIO, which was made June 21, 1949, and which was by its terms to expire July 1, 1950. On February 15, 1950, CIO Local 710 was expelled from the CIO. On the same day the regional office of the United Automobile, Aircraft, Agricultural Implement Workers of America of the CIO (UAW–CIO) notified Respondent that a majority of Respondent's employees had designated it to act as their sole bargaining agent and requested that Respondent voluntarily recognize it as such. Its local was No. 132, which will hereafter be referred to as CIO. The following day, February 16, 1950, CIO filed with the National Labor Relations Board a petition seeking certification as Respondent's employees' bargaining agent. Mr. William Archer, president of Respondent, was away at the time. Early in March, after his return, representatives of CIO called upon him and requested recognition as Respondent's bargaining agent. They were informed that that should be determined by a Board election. Archer so informed Respondent's employees. There

1. The other Respondent will be referred to as the Union or as AFL (Local 161).

is evidence to the effect that he addressed the employees twice, once on March 8, 1950, and again on March 15, 1950, and that he indicated positive opposition to the CIO as Respondent's bargaining agent and suggested the formation of an independent union. A petition for the formation of such a union was circulated but met with no success. A large national independent union, the International Association of Machinists, then began the solicitation of Respondent's employees. The CIO was already so engaged. The former later became affiliated with the American Federation of Labor with AFL Local 161 as its local union. The latter is also a respondent in this action but will be referred to as AFL or Local 161.

April 17, 1950, CIO called a strike. A large number of Respondent's employees responded. Operation of the plant continued. In the latter part of April, 1950, Respondent filed charges with the Board charging CIO with violation of the Act. Early in May the AFL filed a petition with the Board seeking certification as the sole bargaining agent. On June 2, 1950, Respondent, the CIO, and the AFL executed a strike settlement agreement by which all charges were agreed to be withdrawn, all strikers were to return to work, and all parties agreed that an election be held June 30, 1950, to determine the bargaining agent. The withdrawal of the charges was approved by the Board's regional director and the striking employees were reinstated on June 5, 1950. Respondent issued a statement of strict neutrality, and Mr. Archer read a prepared statement to all employees to that effect. The AFL won the election. Thereafter on July 25, 1950, 13 of a total of 38 employees were discharged. Six of them had been actively supporting the CIO in the strike. Four more who had been active in support of the CIO were separately discharged on July 11, August 8, August 22, and September 25, 1950. Two CIO adherents were rehired at reduced wages. All filed charges and complaints charging various violations of the La-bor-Management Relations Act, 29 U.S.C.A. § 141 et seq. One named the AFL with Respondent. All charges were sustained by the Trial Examiner and the Board. The specific charges and the defenses will be stated in connection with the discussion of each issue presented. In general terms those issues are summarized by counsel for Respondent as follows:

"The crux of this case concerns 10 alleged discriminatory discharges or lay-offs and whether the findings are supported by substantial evidence on the record considered as a whole. Of these 10, 3 were discharged for cause in connection with their work, 6 were laid off or terminated as a result of an economic reduction of force, and 1 was discharged for failure to pay uniform initiation fees pursuant to a union-shop contract."

It has been the general policy of this court in recent years not to recite in detail the evidence pro and con in passing upon the issue of the substantiality of the evidence to support findings of the Board. Occasionally there has been a departure from the general policy, ordinarily for the purpose of demonstrating the basis for our conclusion that substantial evidence to support a finding did not exist. We see no reason for departing from the general policy in this case.

It was charged, and the Board found, that the six employees discharged July 25, 1950, Emma Bandy, Ruby Hobbs, Louise Lembke, Nona Shaw, Hazel Timmons and Nadine Ring, were discharged because of their activity on behalf of the CIO in violation of Sec. 8(a)(3) and (1) of the Labor-Management Act, 29 U.S.C.A. § 158(a)(1) and (3). These six employees had been active on behalf of the CIO and had taken an active part in the strike. Neither the Trial Examiner nor the Board found that Mr. Archer was "anti-union", but the record does support the conclusion that he was antagonistic to the selection of the CIO as the bargaining agent after Local 710 was expelled from the CIO. Respondent vigorously contended and now contends that these discharges were for economic

reasons and were made in connection with a reduction in personnel for economic reasons. Respondent insists that there is no substantial evidence to the contrary, and hence the finding of the Board is not supported by substantial evidence.

Nettie Harper was discharged August 8, 1950. She had been an active supporter of the CIO and a picket during the strike, at which time she had several conversations with Mr. Archer. Respondent contended she was discharged because of poor work. The Board found that she was discharged because of her membership in and activities on behalf of the CIO in violation of Sec. 8(a) (1) and (3) of the Act. Respondent contends there is no substantial evidence to support that finding.

Elsie Mary May was discharged August 22, 1950. She had been elected a stewardess of the CIO in February, 1950, and took an active part in the CIO campaign and the strike. Respondent contended she was discharged for inefficiency. The Board found she was discharged because of her CIO union activities in violation of Sec. 8(a)(1) and (3) of the Act. Respondent contends there is no substantial evidence to support the finding.

 As to each of the foregoing, the findings of the Board are supported by substantial evidence. Respondent argues that the Board has shifted the burden of proof to it and has based its findings on the inadequacy of evidence to establish its asserted lawful reasons for the discharges rather than the sufficiency of the evidence to establish unlawful discharges. The Examiner's report and the Board's discussion of the issues both emphasize what is deemed to be an insufficient evidentiary explanation of the discharges consistent with the grounds Respondent contends were the motivating causes of the discharges. This would appear to give some foundation to Respondent's contention. The Board could not place the burden of proof on Respondent. But we do not understand that it did so. In undertaking to point out what it deemed to be the weakness of Respondent's evidence in support of the reasons Respondent assigned for the discharges, the Board was recognizing the rule laid down in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, that the evidence found in the record as a whole must be considered, and the attending requirement that the Respondent's evidence must be weighed and not disregarded. After the Board performs that function and determines which of the opposing contentions is supported by the greater weight of the evidence, on submission of the issue of substantiality of the evidence to support the Board's finding, the court's province is confined to a determination of whether on the record as a whole, including of course the Respondent's evidence, the evidence upon which the Board based its finding was substantial. In doing that the court must make a comparison, not for the purpose of determining which contention is supported by the greater weight of the evidence, but in order to determine whether the evidence relied on by the Board is substantial in relation to the whole. Dannen Grain & Milling Co. v. National Labor Relations Board, 8 Cir., 130 F.2d 321; National Labor Relations Board v. Stafford, 8 Cir., 206 F.2d 19. Respondent's evidence on the foregoing issues is, to us, persuasive, to say the least. But there was substantial evidence to the contrary. Under those circumstances the Board's finding of fact is conclusive.

 September 26, 1950, Respondent rehired Ruby Hobbs and Evelyn Russell, who had previously been employees. Both had been active supporters of the CIO and both had charges pending against Respondent charging discrimination in their previous discharges. Ruby Hobbs was one of the six discharged on July 25, 1950. Both were invited to return to work by Mr. Archer. When they reported they understood that they were to be rehired at 95 cents an hour, the rate of pay that they had

been receiving before their discharge. After they reported but before they were reemployed, they handed Mr. Archer a letter stating that they were not withdrawing their charges and that by reporting for work they were not relinquishing any rights they might have because of their alleged unlawful previous discharge. Whereupon they say that Mr. Archer became angry and stated that "that changes things" and that he would have to consult his attorney. Thereafter he left for a short time and upon his return handed them a written statement reading:

"We offered you employment with this Company of vacancies which have arisen. We are willing to employ you now without prejudice to the charges which you have filed with the National Labor Relations Board. In other words, so far as the Company is concerned, you can process the Labor Board charge if you desire. That has nothing to do with your employment now.

"However, since your present employment is necessarily a new employment, you will therefore return with seniority beginning today, and at the starting rate we are now required to give under the contract which we have with the Union." and then said, "Well, girls if you can get rough, I can get rough, too." The Board found that the reason for the reduction in their starting wage from that which it had theretofore been was because they did not drop their charges, in violation of Sec. 8(a)(1) and (4) of the Act. 29 U.S.C.A. § 158(a) (1) and (4). These facts were disputed, but there was substantial evidence in support of the Board's finding.

As heretofore stated, the consent election for the determination of the bargaining agent was held June 30, 1950. After that election, on August 15, 1950, a new contract was made with the AFL. That contract contained a provision for a union shop. Prior to the 1951 Amendment of the Labor-Management Relations Act, the 1947 Act permitted a union shop provision only after an election at which a majority of the employees voted therefor and the result had been certified. The Board's rules and regulations then in effect allowed five days after the election for either party to file objections to the election. In contrast see Radio Officers' Union of Commercial Telegraphers Union, A. F. L. v. National Labor Relations Board, 347 U. S. 17, 74 S.Ct. 323. Hence, formal certification was held in abeyance pending objection, if any.[2] That election was held August 25, 1950. The vote was favorable to the inclusion of the provision. The Board's representative notified Respondent and the union of the result of the election on August 25, 1950. The result was formally certified on September 5, 1950. The contract provided in effect that no one should be discharged for failure to belong to the union until thirty calendar days after employment or the effective date of the contract, *after* the appropriate provisions of the Labor-Management Relations Act of 1947 had been complied with. Assuming that formal compliance with the Act was not complete until formal certification of the results of the union shop ratification election, National Labor Relations Board v. Kingston Cake Co., 3 Cir., 191 F.2d 563, no discharge was appropriate under the contract or Sec. 8(a)(3) of the Act, 29 U.S.C.A. § 158(a)(3), until thirty days after September 5, 1950.

Prior to August 25, 1950, the AFL Local changed its initiation fee from $2.00 to $10.00 Annabell Woolen refused to pay $10.00, contending she should be admitted for $2.00. On September 21, 1950, the union formally notified Respondent to discharge Woolen "not later than September 26, 1950," pursuant to the contract, for failure of Woolen to tender the $10.00 initiation fee. Mr. Archer showed her the letter. She indicated she would refuse to pay

---

2. "* * * the Board shall * * * take a secret ballot of such employees, and shall certify the results thereof to such labor organization and to the employer."
Sec. 9(e) (1), Ch. 120, Title I, Sec. 101, 61 Stat. 143.

it. He advised her to think it over for a week. She demanded to see a copy of the contract. The president of AFL Local 161 produced a copy for her the next day and after some discussion told her that she would have to pay the $10.00 initiation fee, that she would never get in for $2.00. She testified that she said, "Well, I'll never get in for $10.00." September 25, 1950, two employees asked her if she had joined the union and she said she would pay $2.00 but would not pay $10. Mr. Archer then asked her if she had decided to join the union and she told him she would not pay $10 because the union was discriminating against her. He then told her he would have to discharge her. She was discharged that day, September 25, 1950. On November 30 or December 1, 1950, in a conversation with Respondent's attorney she appears to have expressed the same opinion. The Trial Examiner found that Respondent and the AFL "were well advised that Woolen would not in any event pay the $10 initiation fee," but that the union's demand for the $10.00 was made before the effective date of the union shop agreement and the union shop contract was applied prematurely, hence the Respondent violated Sec. 8(a)(3) and (1) of the Act and the union violated Sec. 8(b)(2) and 8(b)(1) and (A) of the Act. The Trial Examiner found that the union did not discriminate against her when it refused her membership in the Union except at the $10 initiation fee.

The Board approved and adopted the findings. Its order dated May 5, 1953, ordered her reinstatement and payment of her loss of earnings from the date of her discharge on August 25, 1950. The chairman of the Board dissented on the ground that he "would not mechanically apply the usual 8(a)(3) remedy, but would omit any remedy for so technical a violation."

■ The application of the usual 8(a)(3) remedy under the circumstances was arbitrary in a legal sense. The Trial Examiner and the Board found that the union did not discriminate against Woolen when it required the payment of the $10 initiation fee. She refused to pay it after being requested to do so time after time. She was adamant in her refusal at the time of her discharge and fully understood the reason for her discharge. She did not complain that her discharge was premature. Her complaint was that the AFL was discriminating against her. She lost that argument before the Trial Examiner and the Board. While the record does not positively show that she understood she was being offered re-employment December 1, 1950, upon the sole condition that she join the union and without withdrawing her pending charges against Respondent, it shows without contradiction that Respondent's attorney offered to recommend her reinstatement if she paid the $10 initiation fee and told her his recommendation would be accepted. In the same connection the Trial Examiner found, with the approval of the Board, that the record would not justify a finding that Respondent refused her re-employment because she would not agree to withdraw her charges. She did not pay the initiation fee in December, 1950. She has not paid it since. There is not the slightest indication in the record that she would have paid the fee prior to the expiration of the 30-day period following September 5, 1950. The record clearly demonstrates that she would not. The misunderstanding of the union concerning the expiration date of the 30-day period and the Respondent's acceptance of the union's demand that she be discharged did her no wrong or injustice and deprived her of no right she could have had under the course of conduct she elected to follow, unless it be her continued employment for approximately ten days, about which there is and has been no issue. The application of the Sec. 8(a)(3) remedy on behalf of an employee in the absence of any deprivation of any substantial right or injury to the employee must be held to be arbitrary.

The Trial Examiner found that Respondent deducted a fine of one dollar from Edward Field's pay without authority. Apparently this fine was in the nature of an assessment levied by the union against its member Field for non-attendance at a union meeting. Evidently the union notified Respondent to make the deduction. Field quit work for other reasons and, as he expressed it, "I just let it go,"—referring to the one dollar assessment. The general counsel for the Board attached more importance to the incident and amended the complaint at the time of the hearing to charge Respondent with violation of Sec. 8(a)(1) and 8(a)(3) on account of it. The contract between the union and Respondent authorized deductions of only "union membership dues (including assessments if they are regularly part of membership dues) and initiation fees, and turn the same over to the union * * *." The Trial Examiner found, as heretofore stated, that the deduction was unauthorized and that it constituted a violation of Sec. 8(a)(1). The Board approved the finding with one member dissenting. The Board's theory is that the contract did not authorize the deduction and the unauthorized action of Respondent in making it was "calculated to discourage Field in the exercise of rights guaranteed him in Section 7 of the Act,"[3] guaranteeing employees the right to refrain from union activities. The theory of the dissent is that one having joined the union, he may not pick and choose what union activities he will participate in contrary to union rules, and be protected by the Board in disregarding the union rules. The principle involved in the disagreement within the Board is not presented by the facts. We agree with the Board that the contract did not authorize the deduction. That being true, it was for the Board to say whether the deduction was likely to amount to improper coercion in violation of that portion of Section 7 quoted in the preceding footnote. That determination is final unless clearly arbitrary. It does not appear arbitrary.

Mildred Spangler (Ludwig) was discharged July 11, 1950. She was away from work three weeks without permission. Respondent says that is the reason she was discharged. The Trial Examiner and the Board found that the reason was because of her activities on behalf of the CIO. That finding is challenged on the ground that it is not supported by substantial evidence. We find no evidence which in our judgment is substantial to support the finding. Her conduct was so devoid of consideration for the obligation she owed her employer and her employment that the Appeals Referee, in passing upon her application for Missouri unemployment benefits, found that:

"The claimant's actions in this instance represent such a willful disregard of her employer's interest as to amount to misconduct connected with her work. The Referee accordingly finds that the claimant was discharged for misconduct connected with her work."

Unemployment benefits were denied her upon that ground. The dereliction of this employee was so glaring that the Board's condonation of her conduct and its conclusion that she was discharged for other and improper reasons is not supported by the record evidence viewed in its entirety.

The Missouri statute requires that service letters be given discharged employees. Respondent contends that since such letters given employees involved in this action were offered in evidence by the general counsel, the statements contained therein to the effect that the discharges were for reasons other than those prohibited by the Labor-Management Relations Act were binding upon the general counsel and the

---

3. "* * * and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." 29 U.S.C.A. § 157.

Board must accept them as the true reasons for the discharges. The contention is without merit. The letters were naturally offered for other reasons. The weight to be given the statements contained in the letters was, like other evidence, for the Board to determine.

Respondent's assignment that the report of the Trial Examiner, adopted by the Board, is so manifestly biased and unfair that an order based upon it cannot stand is without merit.

■ In its brief Respondent asserts that "The Board's order should not be enforced because of the prejudicial delay in the processing of this matter." The following cases are cited in support of that assignment: United States v. Beebe, 127 U.S. 338, 8 S.Ct. 1083, 32 L.Ed. 121; United States v. Diamond Coal & Coke Co., 255 U.S. 323, 41 S.Ct. 335, 65 L.Ed. 660; LaClair v. United States, C. C., 184 F. 128; The Falcon, D.C., 19 F.2d 1009; United States v. Des Moines Valley R. Co., C.C., 70 F. 435. None of the cases cited has any controlling application. There is no reference to the subject in the Board's brief. The elapsed time between the filing of the charges in the summer of 1950 and the final order of the Board on May 5, 1953, was inordinately long. There may have been good reason for the delay. We are not referred to anything in the record which explains it. A motion by Respondent to dismiss on the ground of delay in filing the complaint is referred to in the record, and an offer of proof was made that Respondent was at all times cooperative with the Board in the investigation of the charges. But that furnishes no explanation. The Act contemplates an expeditious handling of these cases, but we find in the Act no remedy to be applied by the courts for lack of it. The injury to Respondent results from the application of the customary Sec. 8(a) (3) remedy by the Board for the entire period from the date of discharge until date of reinstatement of the employees ordered reinstated. But it is ordinarily for the Board to determine the appropriate remedy within the limits fixed by the Act. In the absence of anything more than appears in this record, there is no justification for giving the question further consideration. See and compare National Labor Relations Board v. Norfolk Shipbuilding & Drydock Corp., 4 Cir., 172 F.2d 813; Eagle-Picher Mining & Smelting Co. v. National Labor Relations Board, 8 Cir., 119 F.2d 903; National Labor Relations Board v. American Creosoting Co., 6 Cir., 139 F.2d 193; National Labor Relations Board v. Cannon Mfg. Corp., 9 Cir., 177 F.2d 197; National Labor Relations Board v. Sun Tent-Luebbert Co., 9 Cir., 151 F.2d 483; National Labor Relations Board v. Central Dispensary & Emergency Hospital, 79 U.S.App.D.C., 274, 145 F.2d 852.

The order of the Board should be modified by eliminating the remedy ordered on behalf of Mildred Spangler (Ludwig) and Annabell Woolen, and as so modified the Petition of the Board for the enforcement of its order is granted.